UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | Criminal Number: 10-245-02 (PLF) |
| v. : | |
| STEPHANIE A. MCCLOSKEY, : | Plea Proceedings: |
| Defendant. : | |

FILED
NOV 19 2010
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

### STATEMENT OF OFFENSE

Had this case proceeded to trial, the United States would have established the following facts beyond a reasonable doubt:

### INTRODUCTION

### Integrated Circuits

An integrated circuit also referred to as "IC", "chip" or "component" is a form of semiconductor. It is an electronic circuit consisting of components and connectors contained on a semiconductor chip. Usually packaged in a plastic or ceramic case, an integrated circuit is a sophisticated, highly miniaturized, solid-state circuit in which all the elements of the circuit are integrated together on a single semiconductor substrate. Integrated circuits contain tiny resistors, capacitors, and transistors on each chip and function as amplifiers, oscillators, timers, counters, computer memory or microprocessors. Integrated circuits form the basis of all modern electronic products. Integrated circuits are used in a variety of applications including consumer electronics, transportation, medical, aircraft, spacecraft, and military.

Counterfeit integrated circuits can result in product malfunctions or product failures and can also cause serious bodily injury including electrical shock, electrocution, and/or death. Counterfeit integrated circuits can also cause significant property damage. Counterfeit

ICs can degrade systems into which they are placed by failing to function when placed into a product or system, by failing to function before their anticipated useful life has expired or by failing to generate correct readings (working at less than optimal status) thereby failing or putting systems and products at risk for failure and necessitating costly systems analysis and replacement. A failed IC can result in an entire computer circuit board being replaced.

Counterfeit ICs also raise national security concerns, because the history of a counterfeit device is unknown, including who has handled it and what has been done to it. The counterfeits in this case were imported from sources in The People's Republic of China and also from a region under the control of China, that is, The Hong Kong Special Administrative Region of the People's Republic of China, "Hong Kong." The devices can be altered and certain devices can be preprogrammed. Counterfeits can contain malicious code or hidden back doors enabling remote systems disablement, communication interception, and computer network intrusion.

Failure of an integrated circuit can result in one of two conditions called "open circuit" or "short circuit." "Open circuit" means that electrical current *is not permitted to flow* as intended. A machine with an open circuit may fail to function or it may fail to turn the unit or its features on. "Short circuit" means that electrical current *is permitted to flow* at times and in places it is not intended to flow or should not flow. A machine with a short circuit left in the "off" position may randomly turn back on or the power switch may fail to turn the unit off.

### **Grade Marking**

Grade markings on integrated circuits indicate that the part is "commercial-grade," "industrial-grade," or "military-grade." Legitimate manufacturers subject military-grade parts to specialized testing. Military-grade integrated circuits are sold to the U.S. military at a price

higher than commercial or industrial-grade, because of the special manufacturing techniques and additional testing required. Such parts have special markings that identify them as military-grade. Military-grade devices are tested to function at extreme temperatures (hot and cold) and/or to withstand extreme vibration. Such ICs are used in military and space applications that must function in such places as those with the extreme heat of the desert or the extreme cold of deep sea, the atmosphere and outer space, and with extreme vibration conditions, such as in a vehicle traveling over rocky terrain or in a missile in acceleration during launch.

### Life Critical Application

A "life critical application" refers to a part that is critical to the safe operation, equipment effectiveness or performance of a system, the failure of which may result in serious bodily injury or death, or significant property damage, including loss of or severe damage to the system as well as harm to third parties and to the environment.

### Trademarks

A "trademark" is a word, phrase (such as a logo), symbol or design (such as an icon), or a combination thereof, which identifies and distinguishes the source of the goods of one particular manufacturer from those of other manufacturers. A trademark is often a valuable asset, equated with the "good-will" of a business organization, which can influence consumers in purchasing decisions. A "word mark" and a "mark drawing" are types of trademarks.

A trademark serves a variety of purposes. First, it avoids product confusion by allowing consumers to have confidence that two products for sale bearing the identical trademark were manufactured by the same company and will be of the same quality. Second, it permits consumers to make an informed choice to purchase a name-brand good based upon past

experience, word-of-mouth, brand loyalty, and advertising impact. Third, it enables consumers who experience a problem with the name-brand product they have purchased to seek recourse through the actual manufacturer by returning the goods to the seller or seeking warranty or other recourse through the original equipment manufacturer ("OEM"). Fourth, it allows the trademark owner to distinguish and protect its products by giving that company exclusive rights as the trademark owner. This permits the legitimate trademark owner to recoup investments of time, money, labor, and creativity and to profit from its endeavors in bringing a particular product to market.

When a counterfeit mark is used in the trafficking of goods and the mark is identical or substantially indistinguishable from the mark registered on the principal register of the U.S. Patent and Trademark Office, such a counterfeit mark is likely to cause confusion, mistake, and deception with consumers.

### Product Line Card

A "Product line card" is a listing of the manufacturers whose products are offered for sale.

### Certificate of Conformance

A buyer may require the distributor to provide a "Certificate of Conformance" also referred to as a "COC." This certificate is a written document, completed by the distributor, which certifies, among other things, that the parts being provided are what they are represented to be and meet form, fit, and function criteria. "Form, fit, and function" is a phrase used in manufacturing to describe an item's identifying characteristics. The phrase describes physical, functional, and performance characteristics and specifications that uniquely identify a component

or device and determine its interchangeability in a system. "Form" relates to size, shape, dimension, and mass. "Fit" pertains to the ability of the item to interface or connect with the system and to become an integral part thereof. "Function" means that the device is able to perform the actions that it is designed to do.

### The Defendants and Their Counterfeiting Activities

From on or about December 6, 2006 and continuing until on or about September 14, 2010, Shannon L. Wren, **STEPHANIE A. MCCLOSKEY** and others known and unknown engaged in the conspiracy to traffic in integrated circuits bearing counterfeit marks, in among other ways, the following. Shannon L. Wren, **STEPHANIE A. MCCLOSKEY** and others known and unknown attracted buyers to VisionTech Components via the website http://www.visiontechcomponents.com/. The product line card for VisionTech Components, which appeared on the VisionTech Components website, listed 107 companies; virtually every known legitimate manufacturer of ICs. Those companies include STMicroelectronics, Analog Devices, Intel, National Semiconductor, and Texas Instruments. Prospective buyers would contact a sales representative of VisionTech Components by telephone. Thereafter, Shannon L. Wren, **STEPHANIE A. MCCLOSKEY**, and others known and unknown would acquire integrated circuits bearing counterfeit marks from sources of supply within China and Hong Kong, import them into the United States, and sell them to the public. Among the devices imported and sold, were those marked with purported, but counterfeit, trademarks and other markings, thereby fraudulently indicating, among other things, that the devices were of a certain brand, a certain date or lot code, a certain country of origin or were newer, higher quality, and/or a special grade, such as military-grade.

### Ownership and Operation of the Inter-related Businesses

Shannon L. Wren owns and operates a number of inter-related businesses. These businesses include Carz, Inc. doing business as VisionTech Components, LLC, also used by Shannon L. Wren as "VisionTech," or "VisionTech Components" without reference to the entity being a limited liability company (LLC); Infuture Electronics, Inc., also known as Infuture Electronics doing business as VisionTech Components, LLC; Vision Properties, LLC; Reborn Couture, LLC; and Cyclone Driver, LLC.

Shannon L. Wren, **STEPHANIE A. MCCLOSKEY,** and others known and unknown used company names and derivations of those names to conduct the counterfeiting operations described herein. **STEPHANIE A. MCCLOSKEY** and other individuals worked for Shannon L. Wren in the business operations. **STEPHANIE A. MCCLOSKEY** was in charge of Administration for VisionTech Components and is co-signatory on certain business bank accounts owned by Shannon L. Wren. During her employ with Shannon L. Wren, **STEPHANIE A. MCCLOSKEY** had significant managerial discretion, including the hiring and firing of employees, training new employees, and supervising day-to-day operations. **STEPHANIE A. MCCLOSKEY**, who did not finish highschool, but did obtain her GED, has no formal training or expertise in the field of engineering. **STEPHANIE A. MCCLOSKEY's** limited training while employed at VisionTech Components consisted of on-the-job training she received under the supervision of Shannon L. Wren.

## THE CONSPIRACY

From on or about December 6, 2006 and continuing thereafter until on or about September 14, 2010, Shannon L. Wren, **STEPHANIE A. MCCLOSKEY,** and others known and unknown, within the District of Columbia and elsewhere, did unlawfully, knowingly, and willfully, conspire and agree together and with each other, and with other persons both known and unknown: to commit offenses against the United States, that is, Trafficking in Counterfeit Goods or Services, in violation of Title 18, United States Code, Section 2320(a); and Mail Fraud, in violation of Title 18, United States Code, Section 1341.

## GOAL OF THE CONSPIRACY

It was a goal of the conspiracy that Shannon L. Wren, **STEPHANIE A. MCCLOSKEY,** and others known and unknown would enrich the businesses through which they operated and would enrich themselves thereby deriving private and commercial financial gain by importing, obtaining control of, selling, distributing, and transporting in interstate and foreign commerce integrated circuits bearing counterfeit marks, some of which were further falsely represented as being "military-grade." The primary economic benefit to **STEPHANIE A. MCCLOSKEY** was approximately $166,141.23, which was obtained by her as a result of her participation in the conspiracy in the form of salary from VisionTech Components.

## MANNER AND MEANS

In order to further the objects and goals of the conspiracy, Shannon L. Wren, and others known and unknown to the grand jury, used the following manners and means, among others:

7

A. Since at least beginning on or about December 6, 2006, Shannon L. Wren, and others known and unknown created an integrated circuit counterfeiting operation at 5120 110th Avenue North, Clearwater, Florida 33760.

B. At all times relevant herein, Shannon L. Wren, and others known and unknown maintained an Internet website for the advertisement of name-brand integrated circuits, including www.visiontechcomponents.com.

C. Beginning on about December 6, 2006, Shannon L. Wren, and others known and unknown acquired from sources in China and Hong Kong, integrated circuits bearing counterfeit marks and imported them into the United States through various ports of entry.

D. Beginning on or about December 6, 2006, Shannon L. Wren, and others known and unknown imported and had integrated circuits bearing counterfeit marks destined for delivery to the address: 5120 110th Avenue North, Clearwater, Florida 33760.

E. At all times relevant herein, Shannon L. Wren, and others known and unknown distributed integrated circuits bearing counterfeit marks in interstate commerce.

F. At all times relevant herein, Shannon L. Wren, and others known and unknown derived private and commercial financial gain from their transactions involving integrated circuits bearing counterfeit marks.

G. At all times relevant herein, Shannon L. Wren, and others known and unknown enriched the companies through which they operated and they enriched themselves with proceeds from the sales of integrated circuits bearing counterfeit marks.

H. At all times relevant herein, Shannon L. Wren employed a sales staff to negotiate

with potential buyers, answer questions, and fill orders for sales of integrated circuits from, among others, companies located within the United States and abroad, including defense contractors.

I. At all times relevant herein, Shannon L. Wren, and others known and unknown received proceeds from the sales of integrated circuits bearing counterfeit marks and deposited the monies into bank accounts which were owned by Shannon L. Wren.

J. From on or about January 1, 2007 through on or about December 31, 2009, Shannon L. Wren, and others known and unknown generated approximately $15,868,009.62 in gross receipts through VisionTech Components arising from the sales of counterfeit integrated circuits.

## OVERT ACTS

Within the District of Columbia, and elsewhere, in furtherance of the above-described conspiracy and in order to carry out the objects thereof, Shannon L. Wren, and others known and unknown committed the following overt acts, among others:

### *Operation and Formation of Businesses*

A. At all times relevant herein, Shannon L. Wren owned and operated VisionTech Components, Infuture Electronics, and Carz, Inc.

### *Operation of the Website*

B. Since on or about December 16, 2002, Shannon L. Wren, and others known and unknown operated the website, www.visiontechcomponents.com advertising brand-name and trademark-protected integrated circuits. The website was available to anyone accessing the Internet.

*<u>Importation of Integrated Circuits Bearing Counterfeit Marks</u>*

   C. Between on or about December 6, 2006, and continuing until on or about August 18, 2010, Shannon L. Wren, **STEPHANIE A. MCCLOSKEY,** and others known and unknown imported from China and Hong Kong on 31 separate occasions, approximately 59,540 integrated circuits bearing counterfeit marks, including military-grade markings, valued at approximately $425,293.20.

*<u>Sales of Counterfeit Integrated Circuits to an Agent of U.S. Immigration and Customs Enforcement (The Undercover Buys)</u>*

### First Undercover Buy From VisionTech Components

On or about June 24, 2009, Shannon L. Wren, **STEPHANIE A. MCCLOSKEY,** and others known and unknown, conducting business as "VisionTech Components" transported in interstate commerce, via FedEx, from the State of Florida to the District of Columbia, integrated circuits, bearing counterfeit marks, that is the purported trademarks of Texas Instruments Incorporated. The counterfeit mark was substantially indistinguishable from a registered trademark of the Texas Instruments Corporation, registration number 2,250,065, which includes the wordmark "TI" inside a design of the map of Texas, a mark that has been in use since 1996, for among other goods and services, integrated circuits, and is registered for those goods on the principal Register of the United States Patent and Trademark Office, the use of which counterfeit mark was likely to cause confusion, to cause mistake and to deceive.

### Willful Blindness by Stephanie A. McCloskey

According to Ms. McCloskey, she engaged in "Willful Blindness" to the truth of what was taking place at VisionTech Components; that is trafficking in counterfeit goods. She deliberately closed her eyes to what would other wise have been obvious to her. While employed at VisionTech Components, she knew that, among other things, the following facts and circumstances took place:

- That VisionTech Components was not an authorized distributor or reseller for any legitimate OEM, ("Original Equipment Manufacturer") including those companies listed on the VisionTech Components' website.

- Shannon L. Wren instructed employees to tell customers and prospective customers that all of the Integrated Circuits they procured were coming from OEMs (Original Equipment Manufacturers) located in Europe. Whereas, Ms. McCloskey knew that approximately 95 percent of the companies from which VisionTech procured integrated circuits were all located in China and Hong Kong.

- On each box to be shipped to a buyer of Integrated Circuits there is a label. The label contains, among other things, the lot, trace, and country code for the devices in the box. The information on the label is supposed to match the number sequences on the actual devices. On a few occasions, Shannon L. Wren would run his fingernail through the number sequence on the box's label, thereby obliterating the number code, making it impossible for the recipient/buyer to discern if the code on the label matched the numbers on the devices contained in the box. Ms. McCloskey knew that a recipient/buyer who received such a box, would likely conclude that the label had been damaged in transit.

11

- On at least one occasion, Shannon L. Wren directed Ms. McCloskey to send integrated circuits bearing multiple date codes to China to have all of the integrated circuits re-marked with the same date code. Ms. McCloskey did as she was instructed.

- On numerous occasions, Integrated Circuits purchased by VisionTech Components from China and Hong Kong arrived in dirty condition. Shannon L. Wren directed employees to use large erasers to remove debris and discoloration from the leads of the devices and essentially polish the leads on the integrated circuits making them appear to be in good condition.

- Shannon L. Wren directed employees to use the chemical acetone to test Integrated Circuits they had purchased from China and Hong Kong to see if the marking came off when rubbed with the chemical. On certain occasions, the markings did come off or degrade, indicating that the markings had been stamped onto the devices.

- On numerous occasions, during 2007 through 2009, at the direction of Shannon L. Wren, Ms. McCloskey mailed to U.S. Customs and Border Protection (CBP) a letter, which requested that CBP not access fines and penalties against VisionTech stemming from the detention of counterfeit integrated circuits imported from China or Hong Kong, which were destined for VisionTech Components. The letter included a number of false statements, including, "After receiving this Notice of Penalty, we worked closely with our attorney to review all applicable US laws and updated and improved our international purchasing and importation procedures. I want to express that we did not intend to order counterfeit product. We do our best to inspect every part for its authenticity and would not purchase or ship counterfeit product intentionally." Ms. McCloskey knew that other than consulting an attorney regarding a Notice of Penalty in approximately August 2007, the attorney was not consulted subsequently nor was she consulted each and every time a CBP

Notice of Penalty was sent to VisionTech Components, as the letter from Shannon L. Wren to CBP suggested. Ms. McCloskey also knew that VisionTech Components procured approximately 95 percent of the Integrated Circuits it purchased from one source in China and did not change their business practices after receiving the CBP notices.

- The VisionTech Components's standard invoice contained a provision headed, "Invoice: Terms and Conditions." This provision stated that, "Any product returns shall be subject to compliance with the sellers (sic.) return merchandise authorization (RMA) policies and procedures...Any claims on product must be made within 30 days of delivery...No returns will be accepted due to electrical failure unless accompanied by a Test Report from an Independent Lab." In certain instances, samples of ICs purchased by VisionTech Components were sent to testing facilities for functional testing. Shannon L. Wren directed Ms. McCloskey that if the test results were "inconclusive," to ship the devices to the buyer.

- Ms. McCloskey was aware of customer complaints, in which the customers represented that they had the Integrated Circuits purchased from VisionTech tested and that the devices were counterfeit. Ms. McCloskey was also aware of customer complaints, in which the customers reported the integrated circuits they had purchased from VisionTech did not function. Shannon L. Wren directed that for such customer complaints, the preferred response was to have the buyer return the ICs to VisionTech and to replace the goods with other ICs. If the buyer did not want replacement goods, Shannon L. Wren directed that a refund be issued to the buyer. During the approximate period January 1, 2007 through December 31, 2009, VisionTech Components issued over $1 million in customer refunds.

- The VisionTech Components's standard Certificate of Conformance contained a provision, purportedly signed by a "Quality Representative." Ms. McCloskey knew that VisionTech Components did not employ an engineer or other quality control expert. The document also stated, "This is to certify that all items included in this shipment have been inspected and conform in all respects to the specification and requirements applicable to the above referenced purchase order... The seller guarantees all items supplied in the above referenced purchase order for 30 days for fot (sic.), form, and function..."

                        RONALD C. MACHEN JR.
                        United States Attorney
                        for the District of Columbia
                        D.C. Bar No. 447889

By: *[signature]*
     SHERRI L. SCHORNSTEIN
     Assistant U.S. Attorney
     D.C. Bar No. 415219
     555 4th Street, NW
     Washington, D.C. 20530
     (202) 514-6956

I declare under penalty of perjury that the foregoing is a true and accurate statement of facts and accurately sets forth a portion of my conduct in connection with this case.

*November 18, 2010*
Dated

*Stephanie McCloskey*
Stephanie A. McCloskey,
Defendant

*[signature]*
Jay A. Hebert, Esq.
Counsel for Stephanie A. McCloskey